OPINION OF THE COURT
Renee R. Roth, S.
As an incident to this private placement adoption, the court *300 is required to determine the paternity of the infant, "Baby Girl S.” (Domestic Relations Law § 111-b).
On May 4, 1988, a married couple commenced a proceeding in this court to adopt "Baby Girl S.”, born April 24, 1988. Included among the papers filed with the court were the extrajudicial consents of the natural mother, Mrs. S. (hereinafter Regina), and her estranged husband, Mr. S.
On June 15, 1988, the court was informed that a Mr. R. (hereinafter Gustavo) had commenced proceedings in the Family Court, Suffolk County, while Regina was pregnant, to establish his paternity of her unborn child and to obtain custody of the child after its birth.
The court thereupon appointed a guardian ad litem, Kevin C. Fogarty (former Judge of the Family Court and now professor of law at St. John’s University Law School), to represent Baby Girl S. and scheduled a conference with all parties.
At the conference, on June 17, 1988, the court ordered that . a human leucocyte antigen (HLA) blood test and a deoxyribonucleic acid (DNA) probe be performed by Roche Biomedical Laboratories, a laboratory duly approved to perform blood genetic marker tests by the New York State Commissioner of Health (Family Ct Act § 532). Moreover, because the infant did not have a legal guardian (her mother having surrendered her for an adoption which was not finalized and her father’s identity being in dispute), the court appointed as guardian of her person the Honorable William J. Grinker, New York City Commissioner of Social Services.
We turn now to the paternity hearing.
Gustavo testified as follows. He met Regina in March or April of 1987 when he began working at a restaurant where she was employed as a waitress. In the middle of May, they dated for the first time. From their next date, a week later, they had sexual relations most times they were together. Gustavo did not use any contraceptive device on any occasion when they were intimate. In the middle of June, when Regina’s nine-year-old son went to spend the summer vacation with his father, Gustavo began staying in her apartment "almost daily”. The "almost living together” arrangement continued until the latter part of August, when Regina announced that her son was returning home. Very soon thereafter, Regina told Gustavo that she thought she was pregnant. Regina said she didn’t think she could afford another child and perhaps it would be better to arrange an adoption. Gus *301 tavo testified that he told Regina that he loved her and wanted both her and their child.
In September, Regina told Gustavo that her menstrual period had been late because she was working too hard.
The court found Gustavo to be a credible witness.
It is observed that because Regina exercised her statutory privilege under Family Court Act § 531 and did not testify, the court is allowed, under law well established in civil cases, "to draw the strongest inference against him [her] that the opposing evidence in the record permits” (Matter of Commissioner of Social Servs. v Philip De G., 59 NY2d 137, 141, and cases therein; Matter of Jane PP. v Paul QQ., 65 NY2d 994; Matter of Liccione v John H., 65 NY2d 826). Applying this principle of law, the court concludes that Gustavo and Regina had sexual relations during May, June, July and August of 1987. No proof was submitted that Regina had sexual relations with anyone else during that period.
The infant’s birth certificate establishes her date of birth as April 24, 1988. The medical records of Huntington Hospital state that the infant was a "term birth”. Since the normal gestation period is 266 days from conception (Matter of Kathy L. R v Steven S, 52 AD2d 974; Baranowski v Luciano, 23 AD2d 815), the court concludes that Baby Girl S. was conceived in the latter part of July, at a time when Gustavo and Regina were having sexual intercourse regularly.
The results of the court-ordered blood tests provide additional confirmation of Gustavo’s testimony. The report concludes that based upon the HLA, red cell antigens, red cell enzymes and serum proteins tests, the probability that Gustavo is the father of Baby Girl S. is 99.99%. The combined paternity index is 56,481 to 1.
Dr. Leon Sussman, an expert witness called by Regina, challenged the reliability of the results of the red cell antigens, red cell enzymes and serum proteins tests. He contended that when a baby is less than three months old, there is a risk of a false report because the baby’s blood still contains many of the mother’s traits. On cross-examination, however, the doctor testified that the life of a blood protein is approximately three months. Thus, where a two-month-old infant’s blood proteins are tested, the proteins derived from the mother’s system are at least two thirds into their maximum life span. Moreover, Dr. Sussman agreed that where the analysis reveals traits in an infant’s blood which are not present in the *302 mother’s, the infant’s blood is essentially her own and the risk of a false report is small. Such appears to be the case here. The analysis of the baby’s blood establishes in the majority of instances that her blood contains characteristics which could not have come from her mother. In fact, Gustavo’s blood contains those same characteristics. These results establish that Baby Girl S.’s blood was well on its way to being her own. Moreover, since the intensity of the characteristics of the infant’s blood derived from a source other than her mother can become only more profound with the passage of time, it is clear that the results of the blood analysis support Gustavo’s paternity.
On the other hand, the expert testified that the HLA test is valid even before an infant’s birth. Based solely upon the results of the HLA test, Dr. Sussman stated that the probability of paternity in this case is 94.60%.
Regina’s estranged husband, Mr. S., submitted an affidavit in the paternity proceeding in Family Court, Suffolk County, in which he denied paternity. It was not, however, considered by this court because of the overwhelming nature of the other evidence.
It is true that of necessity, because of concern for the child, the presumption of legitimacy is one of the strongest and most persuasive known to the law (Matter of Findlay, 253 NY 1, 7; Commissioner of Pub. Welfare v Koehler, 284 NY 260). That presumption, which arose when parentage could not be scientifically ascertained as it can be today, was never intended to suppress truth or deny science, facts and reason. It is, therefore, like most other presumptions in the law, rebuttable (Matter of Findlay, supra, at 8; Matter of Fay, 44 NY2d 137, 142; Golser v Golser, 115 AD2d 695; Dawn B. v Kevin D., 96 AD2d 922, 923; Matter of Joan G. v Robert W., 83 AD2d 838; Matter of Irma N. v Carlos A. F., 46 AD2d 893; Matter of Iris ”GG” v Thomas ”HH” 37 AD2d 1006; Matter of Ruth M. v Robert S., 37 AD2d 915; Moy Mee Soo v Leong Yook Yick, 21 AD2d 45; Anonymous v Anonymous, 1 AD2d 312; Matter of Gorton v Gorton, 123 Misc 2d 1034, 1038; Sylvia B. v Ben., 70 Misc 2d 572, 576).
Moreover, the presumption of legitimacy is a rule of evidence rather than a rule of substantive law. Whether the presumption is overcome is a question of fact which can be determined only after a full hearing where the court can consider all the evidence, including the results of the HLA *303 and related blood tests (Matter of Martine S. v Anthony D., 120 Misc 2d 567, 573; Matter of Hanley v Flanigan, 104 Misc 2d 698, 701).
As many of the cited cases illustrate, the strong presumption may be overcome by the results of blood tests. Utilization of HLA and related tests has been frequent not only to establish that paternity of a putative father is not excluded, but also to establish that such paternity is very likely (Matter of Department of Social Servs. [Sandra C.] v Thomas J. S., 100 AD2d 119, appeal dismissed 63 NY2d 675; Matter of Duquette v Edward FF., 106 AD2d 694, lv denied 65 NY2d 602; see also, Matter of Constance G. v Herbert Lewis L., 119 AD2d 209; Matter of Penny MM. v Bruce MM., 118 AD2d 979; Matter of Karen K. v Christopher D., 86 AD2d 633, 634; Matter of Nassar v Lake, 124 Misc 2d 248).
We turn now to the results of the final blood genetic marker test ordered by the court, namely, the DNA probe, which was also performed at Roche Biomedical Laboratories.
Although the court has not found any decision in this State which discusses the use of such test in a paternity trial (a civil matter), Albany County Court Judge Joseph Harris in a comprehensive opinion recently authorized a DNA test in a criminal proceeding (People v Wesley, 140 Misc 2d 306).
DNA is an abbreviation for deoxyribonucleic acid, its chemical structure. Its discoverers, Dr. James Watson and Dr. Francis Crick, were awarded the Nobel Prize for their work. DNA, a molecule that carries the body’s genetic information, is contained in every living organism in every cell which has a nucleus (over 99% of the cells of the human body).
As discussed by Judge Harris in Wesley (supra), the revolutionary aspect of DNA testing (a genetic and molecular process) is due to the fact that the configuration of the DNA is different in every individual with the exception of identical twins. Therefore, each person has a genetic composition which is unique. Based upon the expert testimony before him, Judge Harris concluded that ”[t]his fact is not only generally accepted by the scientific community to which it is related, but is uniformly accepted therein” (supra, at 307-308). This recognition has been acknowledged by at least one appellate court in this State (People v Crosby, 116 AD2d 731, 732 [2d Dept]) as well as various appellate courts in several other jurisdictions as cited in Crosby.
*304 Indeed, in the instant case, Regina’s expert, Dr. Sussman, confirmed the total acceptance in the scientific community of the validity of the results of DNA tests. He, however, questioned the mathematical computation used to arrive at the combined paternity index (8,077,991 to 1 in this case) but agree that he is not a statistician.
In Wesley (supra), a felony murder case, Judge Harris ordered the test so that a comparison could be made of the blood of the defendant and that of the victim to the bloodstains found on the defendant’s clothing.
Because Wesley (supra) was a criminal case, before the DNA results could be admitted into evidence, Judge Harris was required to hold a hearing on the test’s reliability and general acceptance in the scientific community (Frye v United States, 293 F 1013; People v Middleton, 54 NY2d 42). But there is no such requirement in a paternity trial, where a statute specifically provides for the admission into evidence of blood genetic marker tests. Subdivision (a) of section 532 of the Family Court Act provides that the court on its own motion "shall order the mother, her child and the alleged father to submit to one or more blood genetic marker tests * * * by a laboratory duly approved for this purpose by the commissioner of health * * * The results of any such blood genetic marker test * * * may be received in evidence to aid in the determination of whether the alleged father is or is not the father of the child” (emphasis added).
As mentioned earlier, the court is aware that the use of the DNA probe in a paternity case has not been the subject of judicial comment in this State. In the past, the only tests available to litigants were the HLA and the other blood genetic marker tests mentioned above. In this instance, based upon the request of the guardian ad litem, the court also ordered the DNA probe.
Although DNA testing is a relatively new scientific achievement, its potential application in many areas, including the law, is striking. For the purpose of this paternity case, since it is undisputed that the DNA probe is a blood genetic marker test, it was admitted into evidence under the clear language of Family Court Act § 532 quoted above.
Convincing as is the 99.99% probability of paternity of Gustavo in the HLA and related blood tests, even more convincing is the result of the DNA probe. Although the 99.99% probability of paternity is not increased (unless one *305 takes the percentage out to infinity) the combined paternity index is raised to a staggering 8,077,911 to 1.
Dr. Sussman, as observed earlier, stated that he would disregard this index because the computation used to arrive at the statistic has not been totally accepted. Since he is not a statistician the court cannot accord much weight to this testimony.
More important, Dr. Sussman endorsed the DNA probe as "an extremely accurate way to identify the gene structure of an individual”. He also commented that his calculation of the probability of Gustavo’s paternity at 94.60% would have to be increased by the results of the DNA probe. He did not, however, offer this calculation.
Based upon all the foregoing, the court finds by evidence that is totally clear, convincing, satisfactory and basically uncontroverted that Gustavo is the father of Baby Girl S.
The court wishes to express its gratitude to the guardian ad litem, Professor Kevin C. Fogarty, for the quality of his services and for waiving his compensation.