STATE of Minnesota, Respondent,

v.

Thomas Robert SCHWARTZ, Appellant.

No. C5–89–460.

Supreme Court of Minnesota.

Nov. 3, 1989.

Rehearing Denied Dec. 11, 1989.

Patrick J. Sullivan, Asst. Public Defender, Minneapolis, for appellant.

Thomas L. Johnson, Hennepin County Atty., Steven Redding, Asst. County Atty., Minneapolis, and Hubert H. Humphrey, III, State Atty. Gen., St. Paul, for respondent.

## OPINION

POPOVICH, Chief Justice.

After granting the state's motion to admit evidence of DNA (deoxyribonucleic acid) testing, the Hennepin County District Court, acting pursuant to Minn.R.Crim.P. 28.03, certified the following questions to the Minnesota Court of Appeals, which in turn certified the questions to this court:

1. In determining the admissibility of emerging scientific testing, is a trial court to rely on the *Frye* standard of general acceptability in the scientific community or the relevancy approach derived from Rules of Evidence 403 and 702?

2. May evidence of "DNA Fingerprinting" test results be admissible in a criminal proceeding?

3. In determining the extent of admissibility of scientific test results, is a trial court to rely on *State v. [Joon Kyu] Kim*, 398 N.W.2d 544 (Minn. 1987)?

### I.

The following facts gave rise to the certified questions. The defendant, Thomas Schwartz, was indicted by a Hennepin County grand jury for murder in the first degree under Minn.Stat. § 609.185 (1988) arising out of the stabbing death of Carrie Coonrod on May 27, 1988, in Minneapolis, Minnesota. The police, acting pursuant to a search warrant, obtained a pair of blood-stained blue jeans from Schwartz's residence. A blood-stained shirt was also found in the vicinity of the murder, which the state asserts belongs to Schwartz.

The Minnesota Bureau of Criminal Apprehension (BCA) performed blood group testing on the jeans, shirt and blood samples from Schwartz and Coonrod. These tests confirmed the blood stains on the jeans and shirt were consistent with Coon-

rod's blood. The state also sent these samples for DNA testing to Cellmark Diagnostics Corporation (Cellmark), a laboratory licensed in Maryland and Pennsylvania. Cellmark's report of September 27, 1988 concluded:

All bands in the DNA banding pattern obtained from the blood of Carrie Coonrod are contained in the DNA banding pattern obtained from the stain removed from the plaid shirt. The frequency of this DNA banding pattern in the Caucasian population is approximately 1 in 33 billion. Although no definitive conclusion can be reached, it is the opinion of the undersigned that the DNA banding patterns obtained from the stain removed from the blue jeans and the blood of Carrie Coonrod are from the same individual.

The state sought to introduce the results of Cellmark's tests, but Schwartz opposed the motion.

II.

1. *Frye Standard.*

■ The traditional test for determining the admissibility of emerging scientific techniques is the so-called *Frye* test, named for *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). In *Frye,* the court said:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Id.* at 1014. We have rephrased the *Frye* standard to require that experts in the field generally agree that the evidence is reliable and trustworthy. *See State v. Mack,* 292 N.W.2d 764, 768 (Minn.1980).

The state urges rejection of the *Frye* standard and adoption of an approach that would treat novel scientific evidence like other expert opinion evidence, admitting it if: a) it assists the trier of fact and there is a reasonable basis for it, Minn.R.Evid. 702 and 703; b) it is relevant under rules 401 and 402; and c) the probative value is not outweighed by its potential for unfair prejudice, rule 403.[1] *See* C. McCormick, *McCormick on Evidence* § 203, at 607–08 (3d ed. 1984). To be admissible, relevant and reliable emerging scientific evidence need not necessarily have first passed muster within its appropriate scientific field, as required by *Frye*'s general acceptance prong. *See, e.g., State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980), *cert. denied,* 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981). Without this safeguard, we believe an undesired element of subjectivity is possible in evidentiary rulings under the relevancy approach. The *Frye* standard, on the other hand, facilitates more objective and uniform rulings.

While the relevancy approach has been adopted by several jurisdictions, *see, e.g., United States v. Downing,* 753 F.2d 1224, 1229–32 (3d Cir.1985); *Andrews v. State,* 533 So.2d 841, 846–47 (Fla.Dist.Ct.App. 1988), *cert. denied,* 542 So.2d 1332 (Fla. 1989); *Hall,* 297 N.W.2d at 84–85, the *Frye* standard remains the majority rule. Indeed, we have long applied *Frye* in determining whether scientific evidence is admissible. *See, e.g., State v. Anderson,* 379 N.W.2d 70, 79 (Minn.1985) (graphological personality assessment), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986); *Mack,* 292 N.W.2d at 768 (hypnotically induced testimony); *State v. Kolander,* 236 Minn. 209, 220, 52 N.W.2d 458, 464 (1952) (lie detector tests). Unconvinced by the state of the need for or the wisdom of overruling these prior decisions, we reaffirm that the admissibility of novel scientific evidence is determined by application of the *Frye* standard, and we answer the

---

1. Although the certified question refers only to evidentiary rules 403 and 702, rules 401, 402 and 703 are also pertinent.

first certified question accordingly.[2]

## 2. *Forensic DNA Analysis.*

This certified question presents an issue of first impression for this court, and one involving several basic scientific principles.

DNA (deoxyribonucleic acid) is an extremely long, thread-like chain of molecules found in the nucleus of every cell of the body * * *. The DNA chains are tightly coiled up into bodies called "chromosomes," of which humans have twenty-three * * *. No two individuals, except for identical twins, have identical DNA. Within a given person, however, DNA does not vary from cell to cell. Thompson & Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Virg.L.Rev. 45, 61 & n. 76 (1989). DNA typing is an emerging scientific technique that reveals distinctive patterns in the human genetic material of blood and other body fluids, hair and tissue.

Three commercial laboratories in the United States currently perform DNA analysis: Cellmark (the company that did the testing in this case),[3] Lifecodes Corporation, and Cetus Corporation. Both Cellmark and Lifecodes employ restriction fragment length polymorphism (RFLP) analysis in their DNA testing. RFLP analysis involves the following steps:

1) *Extraction:* DNA is removed from the specimen and "washed" with an organic solvent.

2) *Fragmentation:* the extracted DNA chain is then cut into fragments at specific sites by mixing it with a restriction enzyme.

3) *Gel electrophoresis:* the DNA is placed in a gel to which an electrical current is applied, causing separation of the fragments into bands according to their length.

4) *Southern blotting:* the DNA bands are transferred to a nylon membrane while retaining the same positions they previously occupied on the gel. The double-stranded bands are then treated with a chemical that causes them to separate into single strands.

5) *Hybridization:* genetic probes (DNA clones) are applied, which bind to a specific, complementary DNA sequence on the membrane; the excess probe is then washed off.

6) *Autoradiograph:* the membrane is exposed to an x-ray film and developed so that the DNA banding patterns and their lengths can be visualized. Finally, the autoradiograph is interpreted by comparing the DNA print to another DNA sample to determine if they match based on band length.

See *Cobey v. State*, 80 Md.App. 31, 559 A.2d 391, 397 (Md.Ct.Spec.App.1989), for a helpful diagram of this process.

It is undisputed that RFLP analysis is routinely performed and generally accepted for research and diagnostic purposes within many scientific disciplines. DNA testing is frequently used for paternity purposes and such evidence has been admitted in civil cases. *E.g., In re Baby Girl S.,* 140 Misc.2d 299, 304, 532 N.Y.S.2d 634, 637 (N.Y.Fam.Ct.1988). Forensic DNA typing is heralded as a significant breakthrough because it promises greater specificity of results and may permit analysis of samples too small to be identified by traditional means, such as ABO blood typing.

■ After hearing testimony from 12 experts and making extensive findings, the trial court found that forensic DNA typing using RFLP analysis is generally accepted in the scientific community under the *Frye* standard. Courts in other jurisdictions

---

**2.** A June 1, 1989, legislative enactment allows the admissibility of DNA typing evidence under the relevancy approach. Minn.Stat. § 634.25 (Supp.1989). Because its effective date is August 1, 1989, Act of June 1, 1989, ch. 290, § 22, it does not apply to this case. We are not called to nor do we rule upon the effect of the new legislation.

**3.** Cellmark's technique is known as "DNA fingerprinting." Although forensic DNA analysis is often generically referred to by that name, as in the certified question, we shall avoid that terminology to prevent any confusion.

have reached the same conclusion. *E.g., Cobey,* 80 Md.App. at 43, 559 A.2d at 398 (affirming trial court's conclusion that DNA "fingerprinting" is generally accepted); *People v. Castro,* 545 N.Y.S.2d 985, 999 (N.Y.Sup.Ct.1989) (unpublished pretrial order concluding theory underlying forensic DNA identification is generally accepted); *People v. Wesley,* 140 Misc.2d 306, 332, 533 N.Y.S.2d 643, 659 (N.Y.Co.Ct.1988) (granting motion permitting taking of DNA samples from defendant for testing); *see also Andrews,* 533 So.2d at 850–51 (affirming admission of DNA evidence under relevancy approach); *Spencer v. Commonwealth (Spencer I),* —— Va. ——, —— & n. 10, 384 S.E.2d 775, 783 & n. 10 (Va.1989), and *Spencer v. Commonwealth (Spencer II),* —— Va. ——, —— & n. 11, 384 S.E.2d 785, 797 & n. 11 (Va.1989) (affirming trial court's conclusion that DNA testing is reliable; although *Frye* standard not used in Virginia, court said DNA testing would meet its requirements). Even defense counsel conceded at oral argument that this type of evidence should be admissible in criminal proceedings. While we agree that DNA typing is generally acceptable, we nevertheless believe reliability of the test results is crucial.

Reliability is particularly important in a criminal proceeding because a suspect may face the loss of liberty due to DNA identification. The experts acknowledged that DNA testing could produce a "false negative," where a match between DNA prints is not declared when one in fact exists. Contradictory expert testimony was offered on whether a "false positive," where the wrong individual is identified as the contributor of the DNA sample, could result. We are troubled by the fact that Cellmark admitted having "falsely identified two samples as coming from the same subject" during a proficiency test performed by the California Association of Crime Laboratory Directors (CACLD). Out of 44 total samples, Cellmark made one incorrect match, which was considered too high an error rate by some experts. The possibility of ambiguous match conclusions is also disturbing. For example, the Cellmark report opined that the DNA samples from the stained blue jeans and from Carrie Coonrod's blood "are from the same individual," even though the banding patterns did not fit their match criteria.

As a direct corollary, specific DNA test results are only as reliable and accurate as the testing procedures used by the particular laboratory. Indeed, a New York court, while allowing the admissibility of exclusionary DNA evidence, found the inclusionary DNA test results too unreliable to admit in a criminal proceeding because the laboratory (Lifecodes) failed to use certain generally accepted techniques. *Castro,* 545 N.Y.S.2d at 999. Another court, although allowing DNA test results because the record showed reliable procedures were followed, hastened to add, "[W]e are not, at this juncture, holding that DNA fingerprinting is now admissible willy-nilly." *Cobey,* 80 Md.App. at 43, 559 A.2d at 398. The Technical Working Group on DNA Analysis Methods (TWGDAM), coordinated by the FBI and consisting of 31 scientists from the United States and Canada, has established laboratory procedures for DNA RFLP analysis and quality control guidelines for forensic DNA typing. This group maintains "it is important that any test procedure used by the laboratory possess a high degree of accuracy and reproducibility. Consequently, the use of appropriate standards and controls are essential in order to ensure reliable results." Guidelines for a Quality Assurance (QA) Program for DNA Restriction Fragment Length Polymorphism (RFLP) Analysis 1 (TWGDAM publication). The state and defense counsel at oral argument agreed that such standardization was appropriate and necessary.

Cellmark's testing procedures were extensively reviewed by the experts and the court at the pretrial hearing. Although Cellmark has implemented protocols and certain quality control measures for its technicians to follow, deficiencies in several aspects exist. Laboratory "validation protocols" developed by the FBI were the subject of much testimony. The director of Cellmark's Research and Development Laboratory, Dr. Robin Cotton, admitted that

because Cellmark did not meet all the minimum guidelines, such as formal methodology validation and published results of experimental studies in peer review journals, the FBI likely would not consider their test results ready for use in court. The experts also reviewed similar standards for DNA typing developed by CACLD. Again, Dr. Cotton acknowledged that Cellmark has not comported with all of these standards.

■ Even if a laboratory has followed reliable procedures to ensure accurate test results, constitutional concerns may prevent the admissibility of such evidence. The fair trial and due process rights are implicated when data relied upon by a laboratory in performing tests are not available to the opposing party for review and cross examination. Under our broad discovery rules, defense counsel has the right "to inspect and reproduce any results or reports of physical or mental examinations, scientific tests, experiments or comparisons made in connection with the particular case." Minn.R.Crim.P. 9.01, subd. 1(4); *see also id.* 9.03, subd. 1 (discovery investigations not to be impeded). The prosecution has a similar right. *Id.* 9.02, subd. 1(2). These rules reflect an important presumption in favor of discovery. *Cf. Spencer II,* —— Va. at —— -——, 384 S.E.2d at 785, 791 (written scientific reports were discoverable by defendant but not the "work notes [or] memorandum" upon which the reports were based because such data was expressly excluded by the state's discovery rules).

■ Ideally, a defendant should be provided with the actual DNA sample(s) in order to reproduce the tests. As a practical matter, this may not be possible because forensic samples are often so small that the entire sample is used in testing. Consequently, access to the data, methodology, and actual results is crucial so a defendant has at least an opportunity for independent expert review. In response to a discovery motion, Cellmark disclosed to the defense its "DNA Fingerprinting" protocol, laboratory notes from the testing in this case, the autoradiographs produced during RFLP analysis and statistical frequency tables. The defense request for more specific information regarding its methodology and population data base was denied by Cellmark. Arguably, trade secrets may be at stake for the commercial laboratories. Protective measures could be pursued, however, before denial of discovery is appropriate. *See* Minn.R.Crim.P. 9.03, subd. 5 (protective orders) & subd. 6 (in camera proceedings).

Prejudicial failure to disclose information may result in the imposition of harsh sanctions, such as conviction reversal and the granting of a new trial. *See id.* 9.03, subd. 8; *see also State v. Smith,* 367 N.W.2d 497, 502 (Minn.1985) (denying motion for mistrial); *State v. Zeimet,* 310 N.W.2d 552, 553 (Minn.1981) (reversing for failure to disclose). In a recent Virginia case, the defendant's claim that the trial court erred in permitting testimony on DNA probability statistics that had been updated before trial was rejected because the defendant "was made cognizant of the [new information] before trial" and did not allege any resulting prejudice or surprise. *Spencer II,* —— Va. at ——, 384 S.E.2d at 791. A similar argument regarding the testing laboratory's protocol was not reached because the defendant "waived this claim for purposes of appeal." *Id.* —— Va. at —— n. 5, 384 S.E.2d at 792 n. 5. Moreover, failure to disclose requested evidence which "is material either to guilt or to punishment" violates due process. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *see also State v. Blankenship,* 277 Minn. 32, 34, 151 N.W.2d 410, 412 (1967). While this concern is most often noted where the withheld information is exculpatory, as in *Brady* and *Blankenship,* the constitutional standard nonetheless encompasses other material information. DNA test results are material to the issue of guilt and could have an impact on the trial outcome.

Access to laboratory information generally is significant for another reason. The validity of testing procedures and principles is assessed in the scientific community by publishing the data in peer review journals. The TWGDAM, FBI and CACLD

standards stress that publication of a laboratory's work product and data used in DNA analysis, as well as independent replication and validation studies, are essential prerequisites to reliability. Efforts to assess the reliability of the commercial laboratories' methodology consequently have been hindered because this information has not yet been made fully available. For example, Cellmark has not yet published data regarding its methodology and its probes are only selectively available.

■ While we agree with the trial court that forensic DNA typing has gained general acceptance in the scientific community, we hold that admissibility of specific test results in a particular case hinges on the laboratory's compliance with appropriate standards and controls, and the availability of their testing data and results.[4] We answer the certified question accordingly. Because the laboratory in this case did not comport with these guidelines, the test results lack foundational adequacy and, without more, are thus inadmissible.[5]

### III.

■ In a trilogy of cases culminating with *State v. Joon Kyu Kim*, 398 N.W.2d 544 (Minn.1987), we held that while expert interpretation of scientific results is not foreclosed, a limitation on the use of population frequency statistics is necessary because of the danger that such evidence will have a "potentially exaggerated impact on the trier of fact." *Id.* at 548 (quoting *State v. Boyd*, 331 N.W.2d 480, 482 (Minn.1983)); *see also State v. Carlson*, 267 N.W.2d 170, 176 (Minn.1978). In *Boyd*, we emphasized that:

> [I]t is [not] necessarily wrong to inform the jury of the underlying statistical evidence but that there is a real danger that

the jury will use the evidence as a measure of the probability of the defendant's guilt or innocence, and that the evidence will thereby undermine the presumption of innocence, erode the values served by the reasonable doubt standard, and dehumanize our system or justice.

331 N.W.2d at 483 (citing Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv.L.Rev. 1329, 1355 (1971)).

The state urges us to reject the *Kim* limitation, at least regarding DNA evidence. Probability calculations are integral to DNA typing. The conclusion that DNA prints match is based on the probability that a random individual has the same DNA banding pattern as the sample. The state maintains that statistical evidence will not unfairly prejudice the jury if presented after an adequate opportunity for cross-examination and with limiting instructions. While other jurisdictions admit this type of evidence, *see, e.g., United States ex rel. DiGiacomo v. Franzen*, 680 F.2d 515, 519 (7th Cir.1982); *State v. Stukey*, 242 Kan. 204, 747 P.2d 137, 140 (1987); *Commonwealth v. Gomes*, 403 Mass. 258, 526 N.E.2d 1270, 1279–80 (1988), we are not persuaded that these precautions will adequately safeguard against the dangers inherent in such statistical evidence.

Schwartz contends that any probative value of statistical frequency evidence is outweighed by its prejudicial effect, as illustrated by the media exposure forensic DNA typing has received implying its infallibility. In dealing with complex technology, like DNA testing, we remain convinced that juries in criminal cases may give undue weight and deference to presented statistical evidence and are reluctant to take that risk. Thus, we answer this certified

---

4. We refer to the Supreme Court Advisory Committees on Rules of Evidence and Criminal Procedure for their consideration the task of recommending appropriate standards and procedures. According to the new statutory provision, the Minnesota Bureau of Criminal Apprehension will be following standardized procedures in performing DNA analysis. Minn.Stat. § 299C.155, subds. 2, 3 (Supp.1989).

5. Minnesota's legislature on June 1, 1989, indicated its approval of DNA testing in criminal cases. *Id.* § 609.3461 (requiring DNA testing of sex offenders) and *id.* § 634.25 (Supp.1989) (admissibility of DNA testing results). The effective date of these provisions is August 1, 1989. Act of June 1, 1989, ch. 290, § 22. Our holding today applies only to testing prior to that date. The effect of the new legislation on DNA testing performed after August 1, 1989 is dependent on the facts of some future litigation.

question in the affirmative, reiterating that trial courts should rely on the *Kim* limitation regarding statistical probability evidence.[6]

Certified questions answered.

WAHL, J., took no part in the consideration or decision of this case.

KELLEY, Justice (concurring specially).

I concur in Part I and II of the majority opinion. I likewise concur in Part III, but with considerable reluctance. I feel constrained to do so by the doctrine of stare decisis, or precedent, upon which our common law is based but, nonetheless, take this opportunity to once again urge my colleagues to re-examine the authority upon which this case is premised.

Part III of the opinion is premised on the majority holding in *State v. Joon Kyu Kim*, 398 N.W.2d 544 (Minn.1987). That holding prohibited the use of population frequency statistics in criminal cases. So far as I have been able to ascertain, among the jurisdictions which have addressed the issue, Minnesota stands alone in depriving the jury of this relevant and probative evidence. In my opinion, it occupies that solitary position for reasons I find unpersuasive. *See State v. Joon Kyu Kim*, 398 N.W.2d at 551–553 (Kelley, J., dissenting).

The majority decision in *State v. Joon Kyu Kim* is of recent vintage. Therefore, absent the existence of other reasons not therein considered by the court, admittedly it should not be lightly discarded. However, the fact that 19 state appellate courts and three federal appellate courts have declined to utilize the *State v. Joon Kyu Kim* limitation on the use of scientific population frequency statistics in criminal cases,

combined with the fact that the 1989 legislature provided in section 299C.155 (Supp. 1989)[1] that such evidence should be admissible in criminal cases, I postulate that a re-examination of our ruling in *State v. Joon Kyu Kim* would be neither inappropriate nor unduly precipitant.

---

6. In so holding, we take no position on the recent legislative enactments providing for the admissibility of statistical probability evidence as of August 1, 1989. Minn.Stat. § 634.26 (Supp.1989); *see also State v. Willis*, 332 N.W.2d 180, 184 (Minn.1983) (discussing power to establish rules of evidence). In a special concurrence, Justice Kelley urges reexamination of our holding in *Kim*. We decline to do so here because the recent enactments regarding statistical probability evidence are not before us. We also refrain out of courtesy to the author of our

*Kim* opinion, who did not participate in this decision.

1. Apparently the law was a reaction, at least in part, to the *State v. Joon Kyu Kim* holding. *See* dialogue between Assistant Attorney General William Klumpp, representing the Minnesota Attorney General's office, and Representative Randy Kelly in the House Judiciary Committee, Criminal Justice Subcommittee Hearing on the Omnibus Criminal Control Bill (Section then designated H.F. 315) (March 1, 1989).