668 So.2d 78 (1995)
Larry Randall PADGETT
v.
STATE.
CR-91-1552.
Court of Criminal Appeals of Alabama.
January 13, 1995.
On Application for Rehearing May 5, 1995.
*81 John Mark McDaniel, and William P. Burgess, Jr., Huntsville, for appellant.
James H. Evans, Atty. Gen., Jack Willis, Asst. Atty. Gen., for appellee.
MONTIEL, Judge.
The appellant, Larry Randall Padgett, was convicted of capital murder for the intentional killing of his wife, Cathy Padgett, during her rape. § 13A-5-40(a)(3), Code of Alabama 1975. The jury, by a nine to three vote, recommended Padgett be sentenced to life in prison without parole, but the trial court overrode the jury's recommendation and sentenced the appellant to death.
The following facts are taken from the record. Padgett and his wife, Cathy, were separated but not divorced at the time of her murder. Cathy was living in the couple's home with their two children, and Randall was living in a mobile home near his chicken houses. It is undisputed that Randall was having an affair with a neighbor, Judy Bagwell, and that Cathy knew of the affair.
Cathy Padgett was last seen alive at a church revival service Thursday evening, August 17, 1990. She did not arrive for work Friday morning, nor did she respond to several telephone calls placed to her home that day. Randall Padgett kept the children at his house Thursday night, and took them to his aunt's house Friday morning when he went to work. Friday afternoon, apparently without telling anyone that he was going or without asking anyone to watch his children, Padgett went to Destin, Fla., with Judy Bagwell. Friday evening, Padgett's cousin took the children home to change clothes for that night's revival service and discovered Cathy Padgett's body. The ensuing investigation showed Cathy had been stabbed about 46 times. The evidence showed the appellant had sex with her either as she was dying, or within the 15 minutes following her death.
Police reached Randall Padgett in Florida on Friday night to tell him his wife had been killed. He returned home early Saturday morning and went to the Arab police department. Law enforcement officials questioned Padgett, who then voluntarily gave blood samples. Serologists with the Alabama Department of Forensic Sciences determined that the semen taken from Cathy's body matched Padgett's blood type, and a subsequent DNA test, performed by Cellmark Diagnostics, confirmed that Padgett was the person who had had sex with Cathy at her death. He was then arrested and charged with his wife's murder and rape.

I
The appellant contends that because the state withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), his conviction is due to be reversed. According to the record, near the close of the State's evidence in the appellant's trial, the prosecutor told the defense attorney during a recess that a week before the trial, the State's serologist had conducted a second test on what was supposed to be the appellant's blood. That test showed the blood sample had a different PGM type than the appellant's PGM type. Under cross examination by the appellant's counsel, serologist Rodger Morrison testified as follows:
APPELLANT'S COUNSEL: Rodger, would a person with a PGM type 1/1, would that be the same blood as a person with the blood type PGM 2/1?
WITNESS: Not generally.
APPELLANT'S COUNSEL: They would be different people, wouldn' they?
WITNESS: Well ___

*82 APPELLANT'S COUNSEL: Different blood?
WITNESS: Yes sir.
The second test on the blood sample was made Tuesday, April 7, 1992. Two days later, on Thursday, the second day of trial, prosecutors were made aware that the second test showed a different PGM type than the appellant's. This information was not given to the appellant until Monday afternoon, April 13. By that time, the record shows, the State's DNA experts had already testified. Therefore, as the appellant points out in his brief, the only witness subject to cross examination on the ramifications of the different PGM types was the serologist. Even then, appellant's counsel had a short time to prepare for that cross examination in light of the new, exculpatory evidence. The appellant moved for a mistrial based on the prosecution's delay in providing him with the information despite his requests for discovery and a discovery order issued by the trial court. The trial court denied the motion.
In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-97. To establish a Brady violation, and thus be entitled to a new trial, the appellant must show: 1) that the prosecution suppressed the evidence (here, the different PGM type derived from the blood sample that was supposed to have been taken from the appellant); 2) that the evidence was of a character favorable to his defense; and 3) that the evidence was material. Ex parte Cammon, 578 So.2d 1089, 1091 (Ala.1991), citing Ex parte Brown, 548 So.2d 993, 994 (Ala.1989).
In this case, the record shows the prosecution knew the results of the second test four days before telling the appellant. Because the trial was already in progress when the state became aware of the test results, each day the prosecution delayed in telling the appellant was critical. Also, the State's case hinged on the results of the DNA tests conducted earlier. The DNA evidence against the appellant would only be valid if the blood sample used to match the DNA from the semen found in the victim actually came from the appellant. If the appellant could show that the blood used in the DNA analysis to make that match was not his blood, he would be exonerated. Therefore, results from the second test were both favorable and material to the appellant.
The State argues that because the appellant's counsel was able to extensively cross-examine the serologist who conducted the second test, the new evidence did not change the result of the proceedings. However, as the appellant points out, in Ex parte Williams, 642 So.2d 391 (Ala.1993), the Alabama Supreme Court said:
"The State counters by asserting that [the appellant] had the opportunity to cross-examine [the witness] at trial regarding these items of evidence; it also argues that nondisclosure that merely hampers the defendant's preparation for trial is an insufficient quantum of prejudice to constitute reversible error.... Here, however, the failure to disclose the evidence totally prevented [appellant's] counsel from preparing portions of the defense.... Furthermore, this Court has previously rejected the argument now made by the State, that a defendant who has engaged in `thorough and sifting' cross-examination with respect to items not disclosed has suffered no prejudice."
In this case, the State's failure to timely disclose the exculpatory evidence denied the appellant the opportunity to prepare what would have been a key portion of his defense, that is, that the blood sample used to get the DNA match might not have been his. Cross-examining the serologist did nothing to allow the appellant to determine what the different PGM types would mean to the DNA experts, whose testimony was key in convicting the appellant. The reliability of the DNA tests would be dependent upon the integrity of the samples tested. Therefore, as appellant contends, the DNA experts were entitled to know about the possibility of a mix up or a tainted sample before giving their conclusions to the jury.
*83 We find that the State suppressed evidence that was both material and exculpatory to the appellant in violation of Brady. The appellant's opportunity to cross examine the serologist the afternoon he found out about the second test result was inadequate to cure the violation. Therefore, the appellant's conviction for capital murder is reversed and remanded to the Circuit Court of Marshall County for a new trial.
Because this cause is reversed, we address only those issues that are likely to reoccur at the appellant's new trial.

II
The appellant contends that in addition to instructing the jury on capital murder during a rape, the trial court also should have instructed the jury on the lesser included offense of rape. Failure to do so, the appellant says, constitutes reversible error.
According to the record, the appellant did not request a charge for a lesser included offense of rape, nor was there an objection made at trial that such a charge was not given. In death penalty cases, failure to object does not preclude appellate courts from reviewing the issue under the plain error doctrine, but it does weigh against any claim of prejudice. Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992). The plain error doctrine is only to be used to correct particularly egregious errors in those circumstances in which a miscarriage of justice would result. Stewart, supra; Dill v. State, 600 So.2d 343, 351 (Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala.1992).
"A lesser included offense is generally defined as an offense the elements of which must necessarily be proven in order to convict for the specific higher offense." Holladay v. State, 549 So.2d 122, 128 (Ala.Crim. App.1988), (quoting Ex parte Washington, 448 So.2d 404 (Ala.1984)). In this case, the appellant was indicted on a charge of murder during the commission of a rape. Because the elements of rape must be proven to convict the appellant of capital murder, rape would necessarily be a lesser-included offense. However, the appellant is only entitled to an instruction on a lesser-included offense if that offense is supported by a reasonable theory from the evidence. Holladay, supra at 129; Jones v. State, 514 So.2d 1060, 1063 (Ala.Crim.App.); cert. denied, 514 So.2d 1068 (Ala.1987). "A lesser-included offense charge should only be refused in a death case when the evidence adduced at trial could only support a conviction of the crime charged in the indictment." Holladay, supra (emphasis in the original). Therefore this court must determine whether there is a reasonable theory from the evidence that would support a charge on the lesser-included offense of rape. See Holladay, supra at 130.
Intentional murder becomes capital murder when the killing occurs during a rape. Section 13A-5-40, Code of Alabama 1975. "During" is defined in the Code as meaning "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof." Section 13A-5-39(2), Code of Alabama 1975. An accused is not guilty of a capital offense where the intent to commit the accompanying felony, in this case rape, was formed only after the victim was killed. Connolly v. State, 500 So.2d 57, 62 (Ala.Crim.App.1985), aff'd, 500 So.2d 68 (Ala.1986). An accompanying felony committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction of capital murder; the question of the defendant's intent at the time of the commission of the crime is usually a jury question. See Smelley v. State, 564 So.2d 74, 86-87 (Ala.Crim.App.1990), cert. denied, Ex parte Green, 564 So.2d 89 (Ala.1990); Connolly, supra at 63.
In his charge to the jury in this case, the trial judge instructed, "You may not find the defendant guilty of any offense other than the one charged in the indictment, that of capital murder, or of the lesser included offense, that of murder." He also instructed the jury regarding whether a capital offense was committed:
"If you believe and are convinced beyond reasonable doubt by all the evidence in the case that there was a murder of the intentional type and that a rape occurred as a series of events regardless of the time *84 that it occurred, then you would be entitled to convict the defendant if you are convinced beyond a reasonable doubt that he is the one who did these acts. If on the other hand, you are not convinced beyond reasonable doubt that it is a series of events but rather that it was an afterthought, that there was an intentional murder and then as a mere and simple afterthought that the intercourse occurred, then you would not be authorized to convict the defendant of the crime of a capital offense. In other words, what I am saying is you must determine what was in the mind of the one who committed these acts and it must be proven to you beyond reasonable doubt that it occurred.
"Now, even though you find that the defendant, and are convinced beyond a reasonable doubt, that the defendant had intercourse after the victim was unconscious, incapacitated, or even dead, if you find and are convinced beyond reasonable doubt that it occurred and the intent was to do this as a series of events with no break in the action, then you would be authorized to find the defendant guilty. On the other hand, if you are not convinced beyond reasonable doubt and you find that the defendant committed the act of intercourse as a mere afterthought, sometime after the victim was dead, then you would not be authorized to convict the defendant of capital murder, but only of the lesser included offense of murder."
The jury apparently considered carefully whether the rape occurred as an afterthought to the murder. According to the record, toward the end of its deliberations, the jury asked: "Does defendant have to have intent to commit rape while on the way to commit the murder or before the murder or can the intent come during the commission of the crime of murder or directly after? Which one is capital murder? What about afterthought? What is meant by that?"
The evidence in this case is undisputed that Cathy Padgett was stabbed to death, and that someone had sexual intercourse with her either as she was dying or soon after her death. There is evidence that the sexual intercourse may have occurred as long as 15 minutes after she died. If the jury believed that Cathy Padgett was still alive at the time of the sexual intercourse, then the murder would be in progress and the crime committed would meet the definition of murder during a rape, meaning the jury must convict the appellant of the capital offense. No charge on a lesser included offense of rape would be required. Similarly, if the jury found that the appellant formed the intent to rape the victim while he was killing her, and then had sex with her even though she was dead, he is still guilty of murder while committing the underlying offense, and the capital murder statute still applies. Thompson v. State, 615 So.2d 129 (Ala.Crim.App.1992); Hallford v. State, 548 So.2d 526, 534 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
On the other hand, if, as the trial court instructed, the jury finds that the appellant did not have the intent to rape the victim at the time of the murder, and the sexual intercourse took place after her death, he could not be convicted of capital murder, only the lesser included offense of murder. In that case, because the victim was already dead when the appellant formed the intent to have sexual intercourse, instructing the jury on a lesser included offense of rape would be inapplicable.
Rape, as charged in the appellant's indictment, is defined as sexual intercourse with a female by forcible compulsion. Section 13A-6-61(a)(1), Code of Alabama 1975. If the intent to have sexual intercourse arose after the victim was already dead, there could be no forcible compulsion of the victim to engage in sexual intercourse, thus, although the appellant's act was offensive and repugnant, it could not be rape. We could find no Alabama authority for this holding, however, courts in other jurisdictions have held that a corpse cannot be raped. See e.g., Commonwealth v. Sudler, 496 Pa. 295, 436 A.2d 1376 (1981) (the crime of rape only applies to indignities to the living); Smith v. Commonwealth, 722 S.W.2d 892 (Ky.1987) (sexual intercourse with a dead body is not penalized as rape, but the offense is prohibited by the abuse of a corpse statute). *85 If the intent to have sexual intercourse arose after the victim's death, the crime committed would be abuse of a corpse, defined as knowingly treating "a human corpse in a way that would outrage ordinary family sensibilities." Section 13A-11-13, Code of Alabama 1975.
The appellant's theory of the case is that if he did not commit the crime of rape, then he cannot be convicted of capital murder as charged in the indictment, and he would not be subject to the death penalty. He is, in effect, using the crime of abuse of a corpse as a defense to capital murder. A defendant is entitled to have the trial court instruct the jury on his theory of defense, provided that the theory has legal foundation and is supported by the evidence. Lucero v. City of Birmingham, 592 So.2d 656 (Ala. Crim.App.1991); see also, Sanborn v. Commonwealth, 754 S.W.2d 534, 540-50 (Ky. 1988). The appellant requested that the jury be instructed on abuse of a corpse, but the trial court refused to give such a charge. We hold that if on retrial the evidence supports the appellant's theory, he is entitled to an instruction on abuse of a corpse as a defense to capital murder.
For the reasons set out above, on retrial the trial court should charge the jury on abuse of a corpse, however, the defendant is not entitled to have the jury instructed on a lesser included offense of rape.

IV
The appellant argues that the DNA evidence as presented to the jury was unreliable. While acknowledging that the courts of this state recognize there are reliable methods of DNA testing and the results of such testing can be used as evidence, the appellant contends that the way those results were interpreted for the jury was flawed. Specifically, the appellant says, telling the jury that the DNA in the semen taken from the victim's body matched the DNA in the blood sample taken from the appellant was meaningless without also explaining the approximate population frequency of the DNA patternthe basis for the expert's conclusion that the samples matched.
The appellant cites numerous cases from other jurisdictions, articles in legal and medical journals, and hearings before House and Senate Judiciary committees in support of his contention that population frequency statistics are needed for the jury to have an accurate picture of what a DNA match means. However, Alabama case law holds otherwise. In Ex parte Perry, 586 So.2d 242 (Ala.1991), the Alabama Supreme Court, also citing cases from other jurisdictions and law review articles, explained why the trial court has discretion to exclude population frequency statistical evidence. The Supreme Court quoted State v. Schwartz, 447 N.W.2d 422 (Minn.1989), on the use of population frequency statistics:
"[W]e held that while expert interpretation of scientific results is not foreclosed, a limitation on the use of population frequency statistics is necessary because of the danger that such evidence will have a `potentially exaggerated impact on the trier of fact' (citations omitted). In [State v. Boyd, 331 N.W.2d 480, 482 (Minn.1983)], we emphasized that:
"[I]t is [not] necessarily wrong to inform the jury of the underlying statistical evidence but that there is a real danger that the jury will use the evidence as a measure of the probability of the defendant's guilt or innocence, and that the evidence will thereby undermine the presumption of innocence, erode the values served by the reasonable doubt standard, and dehumanize our system of justice. 331 N.W.2d at 483 (citing Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L.Rev. 1329, 1355 (1971)."
447 N.W.2d at 428.
The Alabama Supreme Court agreed with the Minnesota court's reasoning in Schwartz.
"We are concerned that the testimony unduly encourages the trier of fact in its determination of whether the State has proven guilt beyond a reasonable doubt to focus solely upon a numerical conclusion and to disregard the weight of other evidence (citations omitted).
"These concerns can be properly addressed in an analysis of whether the probative *86 value of the evidence outweighs its prejudicial effect. Even if population frequency statistics are otherwise admissible... if the prejudicial impact of the evidence outweighs its probative value, the evidence is not admissible. Ex parte Smith, 581 So.2d 531 (Ala.1991)."
586 So.2d at 254.
Following a hearing out of the presence of the jury, the trial court in this case, saying that he did not want to put "any odds" in front of the jury, ruled that population frequency statistics were not going to be admitted into evidence. In light of Ex parte Perry, the trial court was within its discretion to exclude such evidence, and no error was committed in excluding population frequency evidence from the jury.
The appellant also argues that the population frequency statistics presented to the trial judge were inaccurate and therefore unreliable. In his brief, the appellant sets out what he contends are flaws in the State's statistical evidence, citing various authorities to back up his contentions. He then uses those contentions to conclude that the State's expert witnesses did not have accurate figures with which to determine a match between the appellant's blood sample and evidence found at the scene.
In Ex parte Perry, 586 So.2d at 253, the Alabama Supreme Court set out the test for the admissibility of DNA population frequency statistics:
I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA population frequency statistics can give reliable results?
II. Are there current techniques that are capable of producing reliable results in DNA population frequency statistics, and that are generally accepted in the scientific community?
III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the actual performance or interpretation of the tests?
The State used two expert witnesses to explain population frequency statistics to the trial court. The appellant cross examined both witnesses, and then had his own expert witness testify about controversy surrounding the State's witnesses' method of compiling their statistics. The trial court then found that there was a theory generally accepted in the scientific community that supports the conclusion that DNA population frequency statistics give reliable results; that there are current techniques capable of producing results in DNA identification that are generally accepted in the scientific community; and that in this particular case, those techniques were followed without any error in performance or interpretation, in accordance with Perry.
Essentially, this issue as raised by the appellant is nothing more than a question of conflicting expert testimony. In reaching its conclusion, the trial court believed the State's experts over the appellant's expert as to the reliability of population frequency statistics. Conflicting evidence is always a question for the finder of fact to determine, and a verdict rendered thereon will not be disturbed on appeal. Knight v. State, 548 So.2d 647, 650 (Ala.Crim.App.1989); Suggs v. State, 403 So.2d 309, 313 (Ala.Crim.App.), writ denied, 403 So.2d 313 (Ala.1981). In this case, the trial court, and not the jury, was the finder of fact as to the population frequency statistics. Therefore, the trial court's finding that the statistics were reliable in this case will not be disturbed on appeal.

V
The appellant also claims the State did not present sufficient evidence to prove beyond a reasonable doubt that he was responsible for Cathy Padgett's murder. The test used in determining the sufficiency of the evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the State, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Crim.App.1992). This Court will not substitute its judgment for that of the jury. Brandon v. State, 542 So.2d 1316 (Ala.Crim.App.1989).
Viewed in the light most favorable to the State, the evidence in this case showed there *87 was no forced entry into Cathy Padgett's home. Nothing appeared to have been taken from the house; in fact Mrs. Padgett was still wearing jewelry when her body was discovered. State forensic pathologist Rodger Morrison testified that the sex act with the victim took place at or near the time of the victim's death. DNA testing showed a semen sample taken from the victim's body matched a blood sample provided by the appellant. Because the sex act happened as the victim was dying or within 15 minutes after her death, the logical assumption is that the person who raped Cathy Padgett was the same person who murdered her. From these facts, a rational jury could find that the appellant murdered his wife during the course of her rape. Therefore, we find that the evidence in this case is sufficient to support a capital murder conviction.
The judgment in this cause is reversed and this case is remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.
TAYLOR, J., concurs specially with opinion.
TAYLOR, Judge, concurring specially.
It is hard to imagine scientific evidence more crucial than blood test evidence showing that the blood found at the scene of the crime was not the blood of the defendant. Withholding such evidence to prevent testing by the opposing party is equivalent to concealment and contrary to the ideal that a court must be a truthseeking forum. Consequently, this is a classic case where law and justice require the disclosure of such evidence to the opposing side.

ON APPLICATION FOR REHEARING
COBB, Judge.
The original opinion in this case was authored by Judge Montiel. This case was reassigned to Judge Cobb on January 27, 1995, when the State filed its application for rehearing. This court's opinion of January 13, 1995, is hereby extended. On January 13, 1995, this court, unanimously, with Judge Taylor concurring specially, reversed the trial court's judgment and remanded this cause based on a Brady violation committed by the State. The State filed an application for rehearing. The following facts are relevant to this court's decision on rehearing.
On October 8, 1990, a test was performed by the State on a blood sample allegedly taken from the appellant. The test revealed the PGM-type of this blood sample was type 2-1. At the same time a test was also conducted on the blood sample of another suspect in this case. The PGM-type of the blood sample allegedly taken from the other suspect was either type 1-1 or 1-0. The sample of the appellant's blood was sent to Cellmark for DNA analysis. The DNA tests conducted on this blood sample revealed that the DNA of this sample matched the DNA of the semen found in the victim's body.
On February 11, 1992, defense counsel had a test conducted on their own sample of the appellant's blood. The test showed that the PGM-type of the appellant's blood was PGM-type 1-1. The results of this test were given to the prosecution on March 17, 1992.
On April 7, 1992, the day before trial, the State conducted a second test on their sample of the appellant's blood. The test results showed that the PGM-type of the blood sample was type 1-1, not type 2-1, as the first test conducted two years earlier had shown.
On April 9, 1992, the State received the results of the test conducted two days earlier. Four days later, on April 13, 1992, the State disclosed the results of the April 7 test to the defense. The disclosure came near the end of the State's presentation of its case.
This court held in its January 13 opinion that "the State's failure to timely disclose the exculpatory evidence [the results of the April 7, 1992, test] denied the appellant the opportunity to prepare what would have been a key portion of his defense, that is, that the blood sample used to get the DNA match might not have been his."
In its application for rehearing, the State seeks to supplement the record with the results of the test conducted by the defense in February, which were provided to the State before trial, but it appears a page of *88 the report was omitted from the record on appeal. The State asks this court to supplement the record with this report and states, "The State expects that the supplement to the record will show that the Appellant was aware of the results of the blood test at issue and that, although the Court is correct in ruling that there was a Brady violation under the facts presented in the case, with the supplementation of the record, the new fact would give this court cause to reverse its decision that a Brady violation had occurred." (Appellee's Brief on Application for Rehearing, p. 2.) (Emphasis added.)
There is no way that the results of the February test conducted by the defense on its own sample of the appellant's blood could have possibly made the appellant aware of the results of the test conducted by the State two months later on the State's own blood sample.
An argument could be made, although it was not made by the State, that because the appellant was aware that his expert found his PGM-type to be different than the PGM-type used to make the DNA match, he could have questioned all of the State's witnesses about the discrepancy between his test results and the State's. This argument, however, is not convincing. It is one thing to examine witnesses concerning differing results between tests conducted by the State on its blood sample and tests conducted by defense witnesses on the defense's sample. It is completely different, and, certainly more compelling, to be able to argue to a jury that the results of the tests conducted by the State itself at two different times produced different results and that the different PGM-types could not belong to the same person. Based on the differing results, a jury could conclude that the State's blood sample was tainted at the time of the first test or that the blood sample belonged to someone other than the appellant.
Although defense counsel was allowed to cross-examine the forensic serologist who conducted the second test about the conflicting results, the defense was certainly entitled to question all of the State's witnesses, including the DNA experts who had made the match between the first blood sample of the appellant and the semen found in the victim's body. The result of the second test could certainly have been useful to the defense in questioning the reliability of the sample sent to Cellmark for analysis. Further, even the trial court admitted it was somewhat confused over the testimony of the serologist concerning the differing results.
The State did not turn over the results of the second test when it learned of them. Instead, the State waited four days after it received the results of the second test to disclose this information to the defense. This was after a hearing on the DNA evidence, after the DNA experts had testified, and after the direct examination of the forensic serologist. The State's intentional delay in turning over crucial evidence, particularly during the course of the trial, was inexcusable, as we held in our original opinion. As Judge Taylor stated in his concurring opinion, "It is hard to imagine scientific evidence more crucial than blood test evidence showing that the blood found at the scene of the crime was not the blood of the defendant." The State's application for rehearing is overruled.
APPLICATION OVERRULED. OPINION EXTENDED.
All the Judges concur.