643 A.2d 1047

M.A., AN INFANT BY HIS GUARDIAN AD LITEM, PLAINTIFF, v. THE ESTATE OF A.C., T.A. AND G.A., DEFENDANTS.

Superior Court of New Jersey
Chancery Division Family Part
Passaic County

Decided October 21, 1993.

*John J. Segreto,* for plaintiff (*Segreto & Segreto,* attorneys).

*Jeffrey M. Riedl,* for defendants (*Macfall, Riedl & Miskowski,* attorneys).

RIVA, J.S.C.

In this paternity litigation, the infant plaintiff known as M.A. sued to establish a parent-child relationship with A.C., alleged to be his deceased biological father. A.C. died intestate survived by three adult children known as R.C., S.C. and L.C. Their mother is J.C. who was never married to the decedent. M.A. seeks to compel blood testing of decedent's children and their mother to aid in proving that the decedent is his biological father.

This is a case of first impression in New Jersey. It involves balancing the compelling state interest in ensuring and protecting plaintiff's interest by helping him to determine his parentage against the privacy rights of decedent's heirs and their mother to refuse submitting to blood testing.

The statutory authority for blood testing of parties is embodied in *N.J.S.A.* 9:17–51(a) of the New Jersey Parentage Act, (Parentage Act) adopted in 1983, which states:

> The court may, and upon request of a party in any contested case brought under P.L.1983, c. 17 (C. 9:17–38 et seq.) shall, require the child, mother, and alleged father to submit to blood tests or genetic tests. The tests shall be performed by a qualified expert appointed by the court.

*N.J.S.A.* 9:17–51(a) is directed at establishing paternity for purposes of establishing a parent-child relationship. It proposes the existence of an alleged living father and does not statutorily authorize the blood testing of siblings and other collaterals.

On the other hand, the statute does not purport to prohibit blood testing in other situations. There is no indication that the statutory language expresses a deliberate policy of limitation. Therefore, this Court concludes that the statute is not controlling in this case, and the general rules of discovery and the court's inherent right to compel the production of evidence must be applied. *Sudwischer v. Estate of Hoffpauir,* 589 *So.*2d 474 (La. 1991) (Lemmon, J., concurring), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 1937, 118 *L.Ed.*2d 543 (1992).

It has been held that forcing a putative father to give a blood sample to adjudicate a paternity issue implicates his Fourth Amendment right to be free of unreasonable searches. *S.S. v. E.S.,* 243 *N.J.Super.* 1, 578 *A.*2d 381 (App.Div.1990), aff'd 124 *N.J.* 391, 590 *A.*2d 1188 (1991). In respect to the necessary prerequisite showing to compel court ordered blood testing, the Appellate Division noted the following:

> In determining a putative father's parentage, we are thus persuaded that there should be some reasonable quantum of individualized suspicion to support court ordered blood testing. Stated another way, the plaintiff should be required to show, as a prerequisite to court ordered blood tests, that there is an articulable reason for suspecting the defendant is the father.
>
> We reiterate that we are not requiring a finding of probable cause. A paternity case is not criminal and a defendant should not be afforded a full panoply of criminal procedural protections. However, as a general rule, something more than the filing of a complaint containing highly conclusory allegations is necessary when the defendant denies paternity.
>
> [*Id.* at 12, 578 *A.*2d 381]

In applying the foregoing standard, it must be noted initially that at the time of M.A.'s birth, his mother, G.A., was married to T.A. Under *N.J.S.A.* 9:17–43(a)1, a presumption was therefore created that T.A. was M.A.'s natural father. Pursuant to a consent order entered by this Court on March 3, 1992, M.A., G.A. and T.A. submitted to a Human Leucocyte Antigen (HLA) blood test that excluded T.A. as M.A.'s natural father. Based upon this fact, M.A. later asserted that the decedent was his biological father. In support of this contention, M.A. relied upon the certification of his mother G.A., which may be summarized in the following fashion.

She met A.C. in 1971 and became friends with him in 1976. In 1977, she began to have sexual relations with him. In the early part of 1979, she became pregnant with M.A., who was born on November 26, 1979. At the time of M.A.'s birth she was married to T.A.

She identified the biological father of M.A. as A.C. After the birth of M.A., T.A. vehemently insisted that- M.A.'s biological father was A.C. After the birth of M.A., A.C. frequently visited G.A. and M.A. at her house. A.C. would bring diapers and baby food for M.A. and fed and cared for him.

In April of 1985, A.C. left his residence and immediately moved into the residence of G.A. and M.A., where he resided until November, 1985. On or about December 1, 1985, A.C., G.A. and M.A. moved to another location where they resided together until A.C.'s death on December 2, 1989.

From the birth of M.A. to the death of A.C., the decedent verbally acknowledged and held himself out to be M.A.'s biological father. Moreover A.C. introduced M.A. as his son to his friends, relatives customers and business associates.

M.A. and A.C. were constant companions. From the time M.A. commenced kindergarten to A.C.'s death, the decedent drove M.A. to and from school. On those days when the decedent was unable to drive M.A. home from school, he made arrangements for a friend to drive him home. In fact, A.C. would arrange his business schedule around M.A.'s school hours so as to enable him to be with M.A.

In considering the results of the blood test excluding T.A. as M.A.'s biological father, this court finds that M.A. has overcome, by clear and convincing evidence, the presumption, created by *N.J.S.A.* 9:17–43(a)1, that T.A. was M.A.'s natural father. *See N.M. v. J.G.*, 255 *N.J.Super.* 423, 605 *A.*2d 709 (App.Div.1992). This court is also satisfied, based upon the certification of G.A., that the plaintiff has established the requisite "articulable suspi-

cion" of the decedent's parenthood. *S.S. v. E.S., supra,* 243 *N.J.Super.* at 12, 578 *A.*2d 381.

Although G.A.'s certification identified A.C. as M.A.'s biological father, plaintiff argues that scientific testing could corroborate his claim. To support plaintiff's contention, his counsel submitted certifications which defense counsel argues violate *R.* 1:6–6.

*R.* 1:6–6 provides as follows:

If a motion is based on facts not appearing of record or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify and which may have annexed thereto certified copies of all papers or parts thereof referred to herein. The court may direct the affiant to submit to cross-examination, or hear the matter wholly or partly on oral testimony or depositions.

In reviewing these certifications, the court is satisfied that *R.* 1:6–6 was not violated. These certifications essentially refer to opinion letters received from Dr. Karl–Hans Wurzinger, Ph.D., Associate Director of Roche Biomedical Laboratories, Inc. and Ruth Koester, Ph.D., Associate Director, and R. Scott Foster, Ph.D., Senior Director, of Genetic Design, Incorporated, regarding DNA blood testing known as a "family study".

In Dr. Wurzinger's letter, he opined:

Family studies are evaluations of the genetic typings of family members of a deceased individual with the objective of reconstructing the genetic makeup of the deceased using information deduced from known first degree relatives.

Cases where there are acknowledged children of the deceased may be resolvable if there are enough children available. By comparing the genetic typings of the mother and the acknowledged children, it is often possible to reconstruct the genetic makeup of their father. The greater the number of children, the higher the likelihood of success. The analysis is made in the following manner. Comparing the genetic test results from the mother and the children, one can deduce which genetic markers the mother passed to the children. All other genetic markers in the children were contributed to their genetic makeup by their biological father. Once these paternal genetic markers have been identified, one examines the genetic typings of the child in question. If all of the paternal obligatory genes in the child are accounted for among the paternal obligatory genes of the acknowledged children, then it is conceivable that the same man fathered the child in question. On the other hand, if not all of the paternal obligatory genes of the child in question are accounted for in the acknowledged children, then there may be insufficient information to answer the question, or the father of the acknowledged children is not the father of the child in question. If the data suggests that the

same man fathered all of the children, then it may be possible to perform a calculation as to the likelihood of paternity given the assumptions inherent in the analysis.

With respect to the infant M.A., it should be possible to reconstruct the deceased alleged father using the genetic information obtained from the deceased's spouse and acknowledged children. With three children available, there is a reasonable likelihood that all of the paternal genes may be identified. That information may then be used to determine if the biological father of the acknowledged children could also be the biological father of M.A.

In the letter submitted by Drs. Koester and Foster, they offered the following opinion:

The paternity matter that you described in your letter dated February 10, 1993 is what we refer to as a family study. In a situation where the alleged father is deceased and no preserved tissue or blood sample remain, then first order relatives such as parents, siblings or children are required for testing. We cannot guarantee that a conclusive determination of paternity can be derived from a family study. However, given the relationship of the individuals available for testing, there is a good chance that we may be able to either exclude AC, or calculate a probability that he is the biological father of MA.

If the mother's former husband has been excluded as the biological father of MA, it would be necessary to test the alleged fathers three known children (RC, SC, and LC) and their mother (JC). Their mother's genetic typing would be extremely helpful in determining which markers expressed in the children were contributed by their father, and thereby identify the markers that he may have contributed to MA. This type of test must assume that AC is in fact the biological father of those three children. It is unnecessary to test the infant's known siblings (GAA and CA) for this case.

To sum up, the following individuals will need to be tested in order to determine whether or not AC can be excluded as the biological father of MA.

MA, GA, RC, SC, LC and JC.

The foregoing letters constitute unsworn expert reports submitted in support of plaintiff's motion. They may be considered by the court without certification or affidavit from the experts. They constitute discovery materials which are not within the parameters of *R.* 1:6–6. *See Baldyga v. Oldman,* 261 *N.J.Super.* 259, 618 *A.*2d 877 (App.Div.1993).

■ It is clear from these experts that DNA testing would be helpful to the Court in determining whether the decedent is M.A.'s biological father. It makes the establishment of paternity an objective finding of fact rather than a self-serving credibility

contest. It may provide conclusive evidence that the decedent is not M.A.'s biological father and be the best evidence for the heirs that the decedent was falsely accused. *See Tipps v. Metropolitan Life Insurance Company,* 768 *F.Supp.* 577 (S.D.Tex.1991). (where DNA blood testing of decedent's family members in order to reconstruct his genetic make-up and thus determine paternity excluded the decedent as infant plaintiff's biological father). It may produce relevant evidence which can be considered by the trier of fact, with other evidence in evaluating M.A.'s claim.

■ Defense counsel contends that prior to ordering the decedent's heirs and their mother to submit to DNA blood testing, a full adversarial hearing is necessary to determine the tests' scientific reliability. This argument, however, was specifically rejected in *S.S. v. E.S., supra,* 243 *N.J.Super.* at 12, 578 *A.*2d 381, by the Appellate Division which stated:

While several decisions in other jurisdictions have required a full adversarial hearing, *see e.g., Rose v. Dist. Court of Eighth Judicial Dist.,* [192 *Mont.* 341], 628 *P.*2d 662 (Mont.1981); *State v. Meacham,* 93 *Wash.*2d 735, 612 *P.*2d 795 (Wash. 1980), we are of the view that documentary submissions may be sufficient.

Although this case dealt with HLA blood testing, this court holds that no hearing is required relative to DNA blood testing. DNA is an abbreviation for deoxyribonucleic acid, its chemical structure. There is no decision in New Jersey which authorizes DNA blood testing in a civil paternity proceeding. Nevertheless, DNA probe results have been held admissible in such a proceeding as a blood genetic marker test in other jurisdictions. *See Matter of Adoption of Baby Girl S,* 140 *Misc.*2d 299, 532 *N.Y.S.*2d 634 (1988) and *In re Paternity of J.L.K.,* 151 *Wis.*2d 566, 445 *N.W.*2d 673 (1989) and *Tipps v. Metropolitan Life Insurance Company,* 768 *F.Supp.* at 577. It has also been held to be scientifically reliable in a criminal case. See *State v. Williams,* 252 *N.J.Super.* 369, 599 *A.*2d 960 (Law Div.1991). See also *State v. Spann,* 130 *N.J.* 484, 617 *A.*2d 247 (1993) (where the Court clarified that it did not decide whether Bayes' Theorem analysis is sufficiently reliable to warrant its use in non-criminal trials, al-

though seemingly authorized by the Legislature in civil cases in *N.J.S.A.* 9:17–52c.)

In reviewing the Parentage Act, it is clear that the admissibility in evidence of blood or genetic tests results from statutory direction pursuant to *N.J.S.A.* 9:17–51(e) which provides:

Whenever blood tests or genetic tests are ordered and made, the results shall be filed with the court and shall be receivable in evidence, but only in cases where definite exclusion is indicated, or where a human leucocyte antigen, electrophoresis or isoelectric test is made to also establish the positive probability of parentage. Expert testimony pertaining to these tests may be requested by the parties. The order for such blood tests or genetic tests also may direct that the testimony of such experts and of the persons so to be examined be taken by deposition. The court, upon application and for good cause shown, may limit the admissibility of the blood tests or genetic tests.

In the instant case, there is no dispute that the DNA probe constitutes a blood test. It is also undisputed that Roche Biomedical Laboratories, Inc. is an expert qualified to perform such testing.

Although *N.J.S.A.* 9:17–51(a) does not statutorily authorize the blood testing sought in this case, this Court holds that the fact that the Legislature provided in *N.J.S.A.* 9:17–51(e) that blood or genetic tests are admissible in evidence is presumptive proof of their accuracy at least where definite exclusion is indicated. This court further holds that any objection as to the test's validity or reliability are matters of weight and credibility to be determined by the trier of fact that ultimately decides the weight to be accorded the test results.

This court recognizes that *N.J.S.A.* 9:17–51(e) limits the admissibility of blood or genetic tests to establish the positive probability of parentage to an HLA, electrophoresis or isoelectric test. For this reason, the presumptive validity and reliability of a DNA blood test for the purpose of excluding paternity derived from this statute is inapplicable to receiving in evidence this test to prove the probability of paternity. Nevertheless, this court concludes that the DNA blood test should be ordered with the understanding that if the test results do not exclude the decedent as M.A.'s father, the decedent's heirs and their mother may challenge the

test results at a Rule 104 hearing if offered to prove that the decedent is M.A.'s father.

Defense counsel argued that since the decedent's heirs and their mother were nonparties to this litigation, the Court lacked the authority to compel them to submit to blood testing. The leading case in New Jersey concerning the authority of a court to order a nonparty witness to submit to blood testing is *Matter of the Estate of Rogers*, 245 *N.J.Super.* 39, 583 *A.*2d 782 (App.Div.1990), in which it was held that, under its inherent power to compel the production of evidence, the court can order a nonparty witness to submit to blood tests to adjudicate the issue of paternity even though the authority is not found under the Parentage Act. It was stated by the Appellate Division in *Rogers, supra,* that:

A trial court is not helpless in dealing with a nonparty witness who refuses to submit to blood or genetic testing. Although the Parentage Act subjects only parties to a court order compelling such testing, a court has inherent power to order anyone within its jurisdiction to submit to such tests when they are needed to adjudicate a genuine issue before it. 'It is well settled that a court possesses the inherent power to call witnesses on its own initiative in the quest for the truth.' *State v. Ross*, 80 *N.J.* 239, 248, 403 *A.*2d 457 (1979). If a court has the inherent power to require a nonparty to give evidence in the form of a testimony in the quest for the truth, it also has the inherent power to require a nonparty to give evidence in the form of a blood sample in the quest for the truth. *See In re Fingerprinting of M.B.*, 125 *N.J.Super.* 115, 309 *A.*2d 3 (App.Div.1973) (sustaining Law Division order that required eighth grade pupils to submit to fingerprinting as part of criminal investigation).

[*Id.,* 245 *N.J.Super.* at 44, 583 *A.*2d 782.]

This court holds that it is not necessary for the decedent's heirs and their mother to be parties to this litigation under the foregoing rationale. Based upon the reports of plaintiff's experts, this court concludes that it is necessary for J.C. to submit to blood testing in order for the test to have any validity. Moreover, one of the named defendants in this case is the Estate of A.C. and, in respect to the decedent's heirs, they are parties in interest, as their rights will be affected by the outcome of this litigation as beneficiaries under the decedent's estate. They are heirs to this estate which remains under administration.

■ With respect to the balancing test which this court must perform, it is noted that at least one court has gone so far as to hold that a putative child of a decedent has a constitutional right to require that the decedent's acknowledged child submit to a blood test, in order that DNA could be compared for paternity purposes where the emotional and financial interests of the putative child in knowing her father's identity overrode invasion of the acknowledged child's right to privacy. *Sudwischer v. Estate of Hoffpauir, supra,* 589 *So.*2d at 474. Regardless of whether or not it is concluded that M.A. has a constitutional right to prove filiation to his alleged deceased father, it is clear that the inheritance rights of legitimate and illegitimate children are entitled to equal protection under the law. *Matter of Sharp's Estate,* 163 *N.J.Super.* 148, 394 *A.*2d 381 (App.Div.1978). See also *Trimble v. Gordon,* 430 *U.S.* 762, 97 *S.Ct.* 1459, 52 *L.Ed.*2d 31 (1977). To prevent M.A. from obtaining court ordered blood testing of decedent's heirs and their mother may deprive him of relevant evidence necessary to establish his right to be treated equally under the law.

It goes without saying that it is important that a child such as M.A. know who he is and from whence he came. In quoting Judge Botter in *In re Adoption by K.,* 92 *N.J.Super.* 204, 208, 222 *A.*2d 552 (Cty.Ct.1966), the court in *J.H. v. M.H.,* 177 *N.J.Super.* 436, 426 *A.*2d 1073 (Ch.Div.1980), acknowledged the profound right of a child to know his or her parents by stating:

> One would expect that a child has a natural yearning to know his true parentage. Every child has the need to feel rooted, to find himself, and to know his true origins. When such knowledge is denied the child may resort to fantasy to fill the void. As the links to his past disappear with time, the search for his identity will become more difficult. The anxiety to learn what was in his past may be pathological, making it more difficult for the child to lead a useful life and to form meaningful relationships. [*J.H. v. M.H.,* 177 *N.J.Super.* at 439, 426 *A.*2d 1073.]

It is just as important that he know who his father is for the potential economic and medical benefits he may derive therefrom.

Among the economic benefits are social entitlements such as social security benefits. Other economic benefits such as veteran's benefits and/or pension benefits dependent upon a legally

recognized parent-child relationship are unavailable to the plaintiff under the facts of this case. In this case, if M.A. prevails, he will receive a social security death benefit since the decedent was insured at the time of his death. 42 *U.S.C.A.* 402(d).

Similarly, inheritance rights, particularly with regard to intestate rights, depend upon the establishment of the parent-child relationship. *See Trimble v. Gordon,* 430 *U.S.* 762, 97 *S.Ct.* 1459, 52 *L.Ed.*2d 31 (1977) and *In re Estate of Sharp,* 163 *N.J.Super.* 148, 394 *A.*2d 381 (App.Div.1978). In this case, M.A. will share equally in the decedent's estate with the decedent's three known biological children if this Court ultimately concludes that the decedent is M.A.'s father. See *N.J.S.A.* 3B:5–10(b).

We also know, based upon well established medical principles, that certain diseases are genetic in origin and may be passed on to offspring. It may be critical to preserving M.A.'s health that he have knowledge of potential diseases, illnesses, abnormalities, birth defects or deficiencies which he may inherit from the decedent and his forbearers. Moreover, knowing his natural genealogy may provide M.A. and his physicians with potential sources for blood transfusions, bone marrow and organ donor transplants.

Decedent's children have a financial interest in opposing M.A.'s claim but have asserted no physical or religious obstacles to a blood test. *Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966). The invasion of privacy in this case is minimal. *Breithaupt v. Abram,* 352 *U.S.* 432, 77 *S.Ct.* 408, 1 *L.Ed.*2d 448 (1957). Decedent's heirs have the alternative of conceding a relationship to M.A.

There is no allegation that the requirements of notice and an opportunity to be heard have not been met. In addition, decedent's heirs and their mother were represented by counsel at the oral argument of this motion.

This court concludes that fundamental fairness prohibits decedent's heirs and their mother from keeping this potentially relevant evidence from the court, which must ultimately decide plain-

tiff's claim, which was supported by a prima facie showing of filiation between M.A. and the decedent, resulting in a contest between competing claimants to the succession assets. *Sudwischer v. Estate of Hoffpauir, supra,* 589 *So.*2d at 477. The state has a legitimate interest in insuring this fundamental fairness by ordering the relevant testing requested by the plaintiff.

For the foregoing reasons, this Court grants the motion filed by M.A. to compel J.C., R.C., S.C. and L.C. to submit to DNA blood testing with the cost for such testing to be paid by M.A., without prejudice to whatever claim he may have against the decedent's estate.