■ In the Matter of COMMISSIONER OF SOCIAL SERVICES OF THE CITY OF NEW YORK, on Behalf of CELIA D., Appellant, v HECTOR S., Respondent. [628 NYS2d 270] —Order, Family Court, New York County (Mary E. Bednar, J.), entered on or about June 24, 1993, which, after a hearing, dismissed the petition seeking an order of paternity and child support with regard to Baby C., unanimously reversed, on the law and the facts, the

petition is granted, and the matter is remanded for further proceedings, without costs.

The Commissioner's ward ("petitioner") initially brought separate proceedings against respondent, seeking paternity declarations on behalf of her fraternal twins born at full term on November 28, 1990. When blood genetic marker tests excluded the possibility of respondent being the father of Baby T., but virtually confirmed his paternity of twin Baby C., petitioner withdrew the former petition and proceeded with the latter.

Testimony reveals that the parties engaged in sexual intercourse about twice per week from as late as September 1989 until February 1990, and never used birth control. Petitioner conceded only one instance during that period when she dated another man, one Joseph R., as a result of a spat she was having with respondent. She recalled the date (January 27, 1990) because it was two days after respondent's birthday, when he had elected to go out with friends instead of spending the evening with her. After dinner and dancing, petitioner and Joseph R. had drinks at a bar and then shared a hotel room, although she testified that she was too intoxicated to remember if she had sexual intercourse with him that night. Petitioner has never claimed that Joseph R. was the father of Baby T.

The blood genetic marker tests administered included red blood cell antigens, enzymes and serum proteins ("RBC"), human leukocyte antigens ("HLA"), and deoxyribonucleic acid ("DNA") probe analysis. These tests excluded the possibility of respondent's paternity of Baby T., but registered a composite 99.99% probability that he is the biological father of Baby C., a "combined paternity index" of "11,734,738 to 1" with respect to the latter. This means, according to the expert testimony, that respondent is over 11 million times more likely to have passed on to Baby C. all of the genes required of the biological father than any other unrelated North American Hispanic man, and the chance of someone else having done so is one in ten thousand.

Dr. Karl-Hans Wurzinger, Associate Director of the Department of Paternity Evaluation at Roche Biomedical Laboratories in Burlington, North Carolina, where the tests were analyzed, testified that if petitioner had ovulated at two different times during a 48 to 72 hour period and had sexual relations with two men within that period, it was entirely possible that each of the eggs could have been fertilized by sperm from a different man. (This unusual circumstance is not unprecedented [see, Matter of F.J.F., 312 NW2d 718 (SD Sup Ct)].) Dr.

Charles Debrovner, an expert obstetrician/gynecologist specializing in fertility, concurred with Dr. Wurzinger's analysis and added that it was even possible, though rare (one chance in 100,000), that such separate fertilizations could take place over an extended period of time,[1] although examination of these twins at birth appeared to confirm prenatal analysis that the gestation periods of the fetuses were approximately equal.

Petitioner testified that her sexual relationship with respondent lasted until the "end of February" 1990 (consistent with delivery in late November), whereas respondent placed the last date of intercourse in "early February". Petitioner testified that she learned of her pregnancy on March 6, having been tested after experiencing morning sickness that day. Respondent countered that petitioner had told him the news even earlier, in late February.

Hospital pre-admission documents variously reflect that petitioner indicated the date of her last menstruation as the 22nd of February or the "end" of that month. Dr. Debrovner stated that petitioner probably conceived 7 to 21 days after the onset of her last menstrual cycle. Using the end of February as the date of last menstruation, conception would have occurred between March 7 and 21, and most likely, according to Dr. Debrovner, around March 14. Using the earlier date (February 22), conception would have been during the first two weeks of March, and most likely around March 7. Calculation of a due date generally varies plus-or-minus 2 weeks (i.e., from 38 to 42 weeks), but the estimated gestation of these babies at 39 + weeks points to conception sometime in late February. There is a handwritten notation in the hospital file reflecting petitioner's last menstrual period as "from 1/mid/90", and the ultrasound report of May 14 lists "1/90?" as that possibility. But conception under that calculation would also have been inconsistent with full-term delivery on November 28.

The date of conception need not be established to a medical certainty in order to establish paternity (*Matter of Nancy M. G. v James M.*, 148 AD2d 714, 716). Family Court erred in ruling that the inconsistency of petitioner's recollections overrode the admissibility of the genetic evidence, citing as precedent several Third Department decisions. In one (*Matter of Moon*

---

1. According to Dr. Debrovner, medical literature records that some women have released a second egg as much as a month after fertilization of an earlier one. There are even instances where a recently impregnated woman can experience isolated bleeding during a missed period, but the fertilized egg is so protected in another area of the uterine wall that it is unaffected and is able to survive.

*[Robin ZZ.] v Mark A.*, 109 AD2d 1017, 1019), HLA test results were deemed "inconclusive in the absence of expert explanatory testimony", which is not the case here. The other three (*Matter of David CC. v Rose GG.*, 142 AD2d 797; *Matter of Terri OO. v Michael QQ.*, 132 AD2d 812; *Matter of Kimiecik [Sandra T.] v Jesse U.*, 111 AD2d 976) all flow from a prior Third Department decision (*Matter of Julie UU. v Joseph VV.*, 108 AD2d 1038, 1039) which summed up the state of the law in 1985 that HLA test results were "yet to be regarded as conclusive and unanswerable evidence of paternity". The latest of these cases, it should be noted, dates from 1988.

We prefer the more modern trend toward admissibility and greater weight given to these genetic marker test results, rather than considering them as just another factor equal to the cloudy testimonial recollections of the parties. Indeed, we note that as of June 15, 1994, such test results which indicate at least a 95% probability of paternity are not only admissible, but create a *rebuttable presumption* of paternity (Family Ct Act § 532, as amended by L 1994, ch 170, § 354). Even the Third Department has conceded, prior to the 1994 amendment, that genetic marker test results, while not conclusive, are now "highly probative on the issue of paternity" *(Matter of Beaudoin [Patricia B.] v Robert A.*, 199 AD2d 842, 844).

In light of the factual inconsistencies (which might be attributable to faulty recollection[2] as well as not uncommon biological variations), juxtaposed with the overwhelming probabilities of the blood genetic marker tests, we find that (a) petitioner's recollection of sexual relations with respondent toward the end of February must have been correct, (b) respondent's recollection of last sexual contact in early February must have been incorrect, (c) petitioner miscalculated her possible sexual activity with another man by about one month, and (d) she was mistaken about the date of her last menstruation.

We hold, as the Second Department did in *Matter of Department of Social Servs. (Debra L.) v William J.* (191 AD2d 558), that the " 'staggering' " genetic marker test results in this highly unusual case were sufficiently persuasive despite petitioner's cloudy and somewhat contradictory testimony as to her sexual activity and menstrual history. We further reject Family Court's rationale that the petition should be dismissed because of the disparity which might be created between developing twin siblings, one of whom has an identifiable father and the other who does not. However compassionately moti-

---

2. Testimony was given in November-December 1992, nearly three years after the sexual activity took place.

vated, this rationale is jurisprudentially unsound. We cannot right every peripheral wrong, but are limited to the parties and issues before us. There may come a time when petitioner will resort to the courts for a determination of Baby T.'s paternal lineage, but that question is not before us, nor can its unresolved state affect the issue that *is* before us— the right of Baby C. to a father and concomitant economic support. Concur—Sullivan, J. P., Wallach, Kupferman, Nardelli and Williams, JJ.